UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TRONDO HUMPHREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-00764-JRS-TAB |
| | ) | |
| CITY OF ANDERSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Entry on Motions for Summary Judgment**

Trondo Humphrey was incarcerated for over twenty-one years before the Indiana Supreme Court granted his petition for post-conviction relief on the ground that he was denied his constitutional right to effective assistance of counsel. *See Humphrey v. State*, 73 N.E.3d 677 (Ind. 2017). All charges against Humphrey were dismissed, and Humphrey filed this action under 42 U.S.C. § 1983 against the City of Anderson police officers who investigated his case and arrested him and the Madison County, Indiana, prosecutor who handled his case. Humphrey alleges that Officers Terry Sollars and Stan Young and Deputy Prosecutor Rodney Cummings violated his due process rights to a fair trial under the Fourteenth Amendment, subjected him to malicious prosecution, and detained and incarcerated him without probable cause in violation of his Fourth Amendment rights. He also alleges that Defendants failed to intervene in the violation of his constitutional rights and conspired to deprive him of

his constitutional rights.   Humphrey seeks damages for trauma he suffered while incarcerated and  emotional damages.

Defendants Sollars and Young filed a motion for summary judgment.   Defendant Cummings filed his own motion for summary judgment.   For the reasons that follow, the Court grants the motions.

## Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). That burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169).   If the movant discharges its initial burden, the burden shifts to the nonmovant, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).   The failure to show a triable issue of fact on just one essential element of the nonmovant's case makes summary judgment appropriate. *Id.*   The Court must construe all facts and draw any reasonable inferences arising from them in favor of the nonmovant. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

2

## Background Facts

The following facts are taken from the record and viewed in the light most favorable to Humphrey, the nonmovant.  Humphrey was sixteen years old when he was arrested for murder.  He was convicted in a jury trial and sentenced to sixty years' imprisonment.  Humphrey spent over twenty-one years in prison before his conviction was overturned and remanded for a new trial.  The charges against him were dismissed, and Humphrey was released from prison in September 2017.

On April 28, 1995,[1] Benjamin Laflin, was shot in Anderson, Indiana.  (ECF No. 125-3 at 1.)  Laflin was from Elwood, Indiana.  Laflin was with his friend, Stephen Sites, in Sites' pick-up truck when he was shot. (*Id.* at 2.)

Terry Sollars and Stan Young were detectives with the Anderson, Indiana Police Department, and Rodney Cummings was the Prosecutor in Madison County at the time.  Sollars was the lead investigator of the Laflin homicide.  (ECF No. 125-3.)  In his first transcribed interview with Stephen Sites, an eyewitness to the shooting on April 29, Sites explained that he had been at a bar with Laflin when Laflin received a call from a friend in Anderson requesting a ride to Elwood.  (ECF No. 125-7 at 4.)  Sites stated that he and Laflin drove to  Anderson, and while their vehicle was stopped, a man approached and said something, but Sites could not understand what he said.  (*Id.* at 4–5.)  Then the man put his gun inside the truck and said something like "give me what you got."  (*Id.*)  Laflin grabbed the man's hand and the gun went off.  Laflin doubled over in the seat, and Sites drove to the hospital.  (*Id.* at 6.)  Sites

---

[1] All dates are in 1995 unless otherwise noted.

described the shooter as "black, in his 20s, probably 5'10", kind of stocky build . . . short hair, about an inch long." (ECF No. 125-7 at 7.) No facial hair and no glasses. (*Id.*) Sites said that the gun didn't make much noise when it went off. *(Id.* at 8.)

During a second interview on April 30, Sollars used certain tactics with Sites including making false statements, threatening Sites with criminal charges, and telling Sites he was lying. (*See, e.g.*, ECF No. 125-8 at 25) (falsely stating that Laflin was conscious and had spoken to police in the hospital); *id.* at 66 (falsely stating that the bullet wound evidence did not match Sites' story).) Sites asked Sollars for reassurances that he would not be criminally charged and that his truck would be returned, and then admitted that the homicide was a result of a drug deal gone bad. (ECF No. 125-9 at 2–4.) Sites explained that Laflin tried to buy drugs from the shooter, got upset when Laflin believed the shooter gave him fake cocaine or "soap" and called the shooter a "n\*gg\*r." (*Id.*) Then the shooter shot Laflin. (*Id.* at 12.) Sites described the shooter: a Black male who was 5'10" to 5'11" with a stocky build and a round, oval, fat, face with short hair, and very dark complexion. (*Id.* at 9–10.)

On April 30, Laflin's girlfriend reported that Laflin had a drug addiction and that his brother, Robert Hensley, had previously taken him to Anderson to buy cocaine. (ECF No. 125-3 at 7–9.)

On May 5, Sollars interviewed Hensley who said he had taken Laflin to Anderson to buy crack cocaine on several occasions. (ECF No. 125-3 at 47–49.) A few months before the shooting, Hensley took Laflin to buy drugs near the Fountain Street Apartments in Anderson, and Laflin had an altercation with and a man named Troy

(ECF No. 125-3 at 48.)  Laflin became upset that Troy was trying to sell him "soap";
Troy hit Laflin in the face, pointed a gun at Laflin, and threatened to kill both Laflin
and Hensley.  (*Id.* at 48–49.)  Hensley heard a gunshot as they drove away.  (*Id.* at
49.)  Hensley described Troy as "male, black, approximately 5'8" to 5'10", medium to
slightly less than medium build, very dark complected, very short hair, with a bright
slick oval type face."  (*Id.* at 48.)  Hensley took Sollars to the area near the Fountain
Street Apartments where Laflin would buy drugs and had the altercation with Troy.
(*Id.* at 49.)  Young did some checking and determined that a man named Troy lived
at the Fountain Street Apartments.  (*Id.*)  Sollars believed that Troy fit Sites'
description of the shooter.  (*Id.*)

On May 8, Sollars spoke with Laflin's mother, Anne Garrison, who reported that
Sites "gave a completely different version of events" to a friend who had been with
Sites the day before than the one he had given to police.  (ECF No. 125-3 at 50.)
Garrison advised that Sites had said that he and Laflin had "conspired to come to
Anderson to rip off [Laflin's] crack dealer . . . [and] steal his dope."  (*Id.*)  Garrison
stated that Sites had said when he and Laflin found the dealer, who goes by the
initials "TNT," Laflin tried to grab the dealer's drugs, and the dealer dove into the
vehicle and shot Laflin.  Garrison said that Sites had stated that the shooting was "a
few blocks away" from where Sites had claimed to police.  (*Id.*)

On May 9, Sollars interviewed Sites again.  Sollars stated that the investigation
had revealed Sites was not being honest; they knew the shooting did not occur at
Nichol and Arrow and did not happen as Sites had claimed.  (ECF No. 125-3 at 51.)

5

Sites said that other than that, the information he had given to police was truthful. He took Sollars to the location where the shooting had actually occurred—in an alley next to the Fountain Street Apartments in the 1400 block of Fountain Street near the parking lot. (ECF No. 125-3 at 52–53.) Sites described the shooter as "about 5'10", really dark skin, full lips, short hair, stocky build . . . fairly broad shoulders . . . not really big but [not] skinny by any means" with no facial hair. (ECF No. 125-10 at 10–11.) Sites described the gun "as a very small caliber, black colored" semi-automatic. (*Id.*) Sollars concluded that the shooter "probably live[d] in the immediate area" of the shooting. (ECF No. 125-3 at 52–53.) Based on the results of a voice stress test, Sollars concluded that Sites was being truthful. (*Id.* at 53.)

On May 18, Hensley told Sollars that "TNT" or "Troy the Triggerman" was the shooter. (ECF No. 125-3 at 59.) Sollars testified that any steps he took in relation to that lead should have been placed in a police report. (ECF No. 139-1 at 63.) However, his reports do not indicate that he did anything with this lead. (ECF No. 125-3.) Sollars received information on other potential suspects and he has no recollection of following-up on any of them. (*See, e.g.*, ECF No. 125-3 at 21, 35; ECF No. 139-1 at 47–48.) Many of these potential suspects were drug dealers in Anderson in the early 1990s. (Young Dep. Tr. 165, ECF No. 139-2 at 89, 90.)

On June 2, Cummings contacted the Anderson Police Department and requested that a detective speak with a confidential informant (CI). (ECF No. 125-3 at 83.) Young met with the CI, who was incarcerated at the Madison County Jail. (*Id.*) According to Sollars and Young, the CI reported that he was sharing a cell block with

Roosevelt Brooks who had given the CI information about the Laflin murder: the shooting occurred in an alley in the rear of the Fountain Street Apartments just east of 14th Street, (ECF No. 125-3 at 83; ECF No. 125-23 at 43–44); two white men in a dark truck made contact with Brooks seeking drugs; Brooks left to get cocaine, leaving the suspect—"Nunardo"—at the location with the men, (ECF No. 125-3 at 83–84.); upon returning, Brooks observed Nunardo running back, and Nunardo said he "had to shoot . . . he grabbed my gun"; and the suspect had sold the weapon. (*Id.* at 84.) Sollars and Young contacted the CI who advised that he had asked around and learned the suspect was Humphrey, and Nunardo was Humphrey. (*Id.*)

On June 6, based on the information allegedly provided by the CI, Brooks was brought to the police station for an interview with Young and Sollars. (ECF No. 125-3 at 65.) Brooks was nineteen years old and had noticeable intellectual disabilities. (ECF No. 139-2 at 57–58 (Young testifying that Brooks was noticeably slow mentally).) Sollars first told Brooks they had information that Brooks had attempted to deal cocaine to Laflin, but left, and another subject had gone up to the truck and attempted to deal cocaine and shot Laflin, and the subject told Brooks he had been robbed by two white guys. (ECF No. 125-3 at 65.) Sollars told Brooks they were prepared to assist him on charges depending on his cooperation with the homicide investigation. (*Id.*) Brooks denied any involvement and stated that anyone who said he was in the area the night of the shooting was lying. Brooks was not told the location of the shooting. (*Id.*) Sollars told Brooks that that was the only chance for

him to talk to police, and if he were later arrested and charged for homicide, he would be facing 40 to 60 years in prison.  (ECF No. 125-3 at 65.)

On June 10, Brooks was picked up on a probation violation and put in jail.  (ECF 125-6 at 11.)  Sollars visited Brooks several times while Brooks was in jail.  (ECF No. 139-1 at 104; ECF No. 139-8 at 9, 11 (police came to speak with Brooks "six or seven" times while he was in jail).)  The police told Brooks they believed Humphrey had committed the murder and that it had taken place in the alley behind Brooks' house. (ECF No. 139-8 at 10–11.)  They showed Brooks photos of the victim's truck, which Brooks claims that was how he could describe it.  (ECF No. 139-8 at 12–13.)

On June 13, Brooks testified under a prosecutor's subpoena, which was a device used by law enforcement to require witnesses to testify under oath during an investigation.  (ECF No. 139-4 at 18.)  Cummings spoke to Brooks briefly about the case before he was placed under oath.  (ECF No. 125-3 at 72; ECF No. 130-1 at 108–10.)  Then Brooks testified that on the night of April 28 and morning of April 29, he was in his garage with another black male known as Nano; a pickup truck drove by and Nano said they were geeks and went after them; a few minutes later, Nano returned and said, "I got them" and "I shot him"; and about a week later, Nano told Brooks he had sold the gun.  (ECF No. 125-3 at 72.)

Two days later, Sollars met with Brooks and threatened him with perjury charges if he did not admit that the person he called Nano, in his testimony was Humphrey. (ECF No. 125-3 at 75–76.)

On June 19, Sollars showed Brooks a photo line-up, including Humphrey.  Sollars told Brooks that "[he] knew [Brooks] knew who Nano was in this line up and [Sollars] was going to forward information to the Prosecutor's Office of [Brooks'] arrest on May 12, 1995 with Trondo Humphrey, who is Nano, as well as his knowledge of being with Nano the night of the shooting and recommend Prosecutor Cummings file perjury charges on him." (ECF No. 125-3 at 77.)  If Brooks cooperated, however, Sollars would help him with his parole violation.  Brooks picked Humphrey's photo out of the line-up, identifying him as Nano.  Sollars asked for a written statement.  Sollars wrote the statement out, and Brooks signed it.  (*Id.*)

Sollars completed an affidavit of probable cause for the arrest of Humphrey for the murder of Laflin.  (ECF No. 125-3 at 101–03.)  The affidavit stated that the driving the truck in which Laflin was shot [Sites] "described the location and gave an initial physical description of the suspect" and "described how the shooting occurred." (*Id.* at 101.)  The affidavit stated that the witness described the shooter as "M/B, 5'9, 150/med. build, dark complexion." (*Id.* at 102.)  Sollars attributed information to the CI—that he heard Brooks say he was there when the white guy from Elwood was shot and that Brooks knew the shooter.  (*Id.* at 101.)  In addition, the affidavit summarized Brooks' testimony under the prosecutor's subpoena and stated that "Brooks described how the shooting occurred and the exact location" of the shooting as reported by the witness driving the truck [Sites]," (*id.*), and that Brooks knew Humphrey and had picked his photo out of a lineup.  (*Id.* at 102.)

Humphrey was arrested for the murder later that day (June 19).  (ECF No. 125-3 at 81.)  Humphrey is 5'9" tall and weighed 155 pounds.  (ECF No. 125-3 at 101; ECF No. 125-25 at 93.)  At a detention hearing on June 20, the parties stipulated to probable cause, and Humphrey was detained.  (ECF No. 125-12.)

On August 16, Sollars interviewed Donnie Smith.  (ECF No. 125-3 at 86.)  Sollars told Smith about the case before questioning him.  (ECF No. 139-1 at 133.)  Brooks previously told Smith what the police were saying about the Laflin homicide.  (ECF No. 125-15 at 77, 124.)  Smith told Sollars that the night of the homicide, Smith, Brooks, and Humphrey were in Brooks' garage when a dark colored truck come down the alley; Nano yelled out "BLOW," meaning he had drugs for sale; the truck stopped outside the garage; Nano got into the truck; the truck drove off; suddenly the truck stopped, Nano got out, and the truck drove away very fast; then Nano ran back and said that the "MF tried to gank him so he got him."  (ECF No. 125-3 at 86.)  Smith said Nano carries a small caliber chrome auto handgun and observed him with a gun a few days before and after the shooting.  (*Id.*)  Smith identified Humphrey as Nano from a photo array.  (*Id.* at 87.)

On October 27, Brooks provided an affidavit retracting his statements that Humphrey had committed the Laflin murder.  (ECF 139-11 ¶¶ 3–10.)  Brooks averred that police had "told [him] what they thought had happened, and they wanted [him] to support their story."  (*Id.* ¶ 4.)  Brooks stated that he had been alone in his garage the night of the murder; no one, including Humphrey had been with him; Humphrey did not tell Brooks that Humphrey shot anyone; and Brooks did not hear any shots

fired while he was in his garage.  (*Id.* ¶¶ 5–8.)  Brooks asserted that the police asked him to sign a statement, which he did, without first reading it.  (*Id.* ¶¶ 10–11.)

At Humphrey's criminal trial in January 1996, Brooks testified that his statement to police identifying Humphrey as the shooter was not true but was a result of pressure.  (ECF No. 125-15 at 64 ("he [Cummings] told me that [was] who they thought it was, so that's what I said. Got to makin' stuff up, and then, here I am.").)  Brooks testified that "[Cummings] was on my back, . . . they came to me with the story, really, I just added on pieces."); *id.* at 72 (Detective Sollars "came to him with this story.").)  Brooks added that Cummings and Sollars were "on [his] back.  All in my face talkin' crazy, so [he] just went along with it," (*id.* at 76), and they were "sayin' all kinds of stuff.  Callin' me bitches and punks, and tellin' me I was lying, all that.  All kinds of stuff," (*id.* at 76–77).  The trial court admitted Brooks' pretrial written statement as substantive evidence.  (*Id.* at 66, 73.)  Brooks testified that the words in the written statement were not his and it was "a lie."  (*Id.* at 85.)  Brooks also testified that he was not with Humphrey the night of the murder, Humphrey never told Brooks that Humphrey shot someone, and Brooks did not see Humphrey commit the murder.  (*Id.* at 122.)

Smith testified at Humphrey's criminal trial, too; Smith's testimony was consistent with his August 16 interview statements.  (ECF No. 125-15 at 32–36.)  However, Smith also testified that he did not see Humphrey with a gun, did not hear a gunshot that night, and Humphrey did not say that he shot someone.  (*Id.* at 52.)

At Brooks' deposition in this case, Brooks testified that he had no knowledge about the shooting of a white guy from Elwood, he did not witness that shooting, he did not know when the police came to talk to him who had committed that shooting, and he still did not know.  (ECF No. 139-8 at 6–7.)  Brooks explained that he believed the only way to get the police to leave him alone and stop pressuring him was to agree that Humphrey committed the murder, so Brooks eventually agreed, even though that was false.  (*Id.* at 12, 14.)  In addition, Brooks believed that if he went along with the police story, the police would help him on his parole violation charge and help him get some money back.  (*Id.* at 13.)

The CI, testifying in his own criminal trial, denied providing Sollars with any information about a murder case that led to a conviction in the court in which Humphrey was convicted.  (ECF No. 139-6 at 10.)  The CI testified that Sollars came to him with a person's name, not the other way around, and Sollars asked the CI about that person.  (*Id.* at 19–20.)  The CI said he never contacted anyone in law enforcement and said he had information in a murder case and he wanted to talk.  (*Id.* at 26.)  When asked if "out of all the people that . . . Sollars could have spoken to [in] trying to solve a murder case, he just came to you?, the CI answered, "Yes." (*Id.*)

## Discussion

Humphrey brings several claims against Defendants under 42 U.S.C. § 1983:  (1) Count I alleges a due process claim for deprivation of his Fourteenth Amendment right to a fair trial; (2) Count II makes a procedural due process claim under *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013); (3) Count III states a claim for deprivation of

liberty absent probable cause in violation of the Fourth Amendment; (4) Count IV alleges a claim for failure to intervene in the violation of constitutional rights; and (5) Count V claims a conspiracy to deprive Humphrey of his constitutional rights. Sollars, Young, and Cummings seek summary judgment on all claims.  "Section 1983 imposes liability on '[e]very person who, under color of any . . . State [law]' violates the federal rights of another."  *Jones v. Cummings*, 998 F.3d 782, 786 (7th Cir. 2021) (quoting 42 U.S.C. § 1983).

### Counts I, II, and III

"The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause."  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918 (2017); *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) ("A claim for . . . pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause.").  "[P]robable cause for an arrest exists 'if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime.'"  *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) (quoting *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013)).

The existence of probable cause for arrest bars § 1983 claims for unlawful arrest, unlawful detention, false imprisonment, and malicious prosecution.  *See Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990) (citation omitted).  There is an exception: probable cause is no defense if the finding of probable cause was based on intentional

misrepresentation or concealment of material facts. *Id.* Defendants contend that based on the facts learned during the homicide investigation, there was probable cause to arrest and detain Humphrey for the Laflin murder. Humphrey responds that probable cause was based on fabricated evidence, namely Brooks' statement, and the statement must be set aside for purposes of determining whether there was probable cause in this case. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

The Fourteenth Amendment's Due Process Clause prohibits law enforcement officers from depriving a defendant of a fair trial by knowingly using false evidence, including false testimony, to obtain a conviction. *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 344 (7th Cir. 2019). To prevail on a due process claim based on the fabrication of evidence, Humphrey must prove not only that the evidence was false, but also that Defendants knew—"with certainty"—that the evidence was false. *See id.* Humphrey bears the burden of presenting evidence of Defendants' knowledge; Defendants are not required to disprove Humphrey's hypotheses. *See Coleman*, 925 F.3d at 345.

The Seventh Circuit has "explained that there is a difference between coercing witnesses to testify and fabricating witness testimony." *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014). "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false." *Id.* "In fabrication cases, the police or prosecutor manufactures evidence that he *knows* to be false." *Id.* (emphasis added); *Whitlock v. Brueggemann*, 682 F.3d 567, 571–72 (7th Cir. 2012) (the

14

prosecutor was part of an investigative team that told witnesses what to say knowing that the information given the witnesses was false).  The "hallmark of a fabrication case" is that the officer or prosecutor "created evidence that [he] knew to be false." *Petty*, 754 F.3d at 423.

Thus, the alleged fabrication of Brooks' statement is central to Humphrey's claims.  Defendant Officers argue that Humphrey has no evidence of fabrication of Brooks' pretrial written statement.  Defendants assert there is no evidence that Brooks' statement was false or that Sollars and Young knew that Brooks' statement was false.  Defendant Officers assert that Brooks testified at trial that he made up the details in his written statement on his own.  They also rely on Brooks' deposition testimony that the officers told him what they thought had happened, and he believed they thought that was what happened.  (ECF No. 125-19 at 19–20.)  Similarly, Cummings contends that Humphrey has insufficient evidence that Cummings fabricated any evidence.

There is a dispute as to whether the CI informed law enforcement that Brooks had given him information about the Laflin murder.  Other than the initiation of contact by the CI, which the CI denies, Defendant Officers have offered no explanation for why they had any reason to suspect Brooks had information about the Laflin murder.  Humphrey argues that this supports a finding that Brooks' statement was fabricated.  Nonetheless, even if the jury finds that the CI never reached out to law enforcement about the Laflin murder and the CI did not give law enforcement any information

about the murder,[2] the evidence falls short of raising a genuine issue of fact as to whether Brooks' statements implicating Humphrey were false and whether Defendants knew Brooks' statements were false.

Humphrey maintains that Brooks' statement "was fed to him" and he repeated it only as a result of coercive interrogation tactics. (ECF No. 140 at 31.) Humphrey then conflates a statement's reliability and fabrication. (*Id.* at 32–33.) Fabricated evidence by definition cannot be reliable, but an unreliable statement is not necessarily fabricated. *See Petty*, 754 F.3d at 422 ("Coerced testimony . . . may be true or false. Fabricated testimony is testimony that is made up; it is invariably false.").

Humphrey argues that "feeding facts to witnesses" is a form of fabrication. *Whitlock v. Brueggemann*, which he cites for support, does not stand for that proposition. In *Whitlock*, law enforcement put a witness with known alcohol problems "in seclusion for several days in a hotel," gave him money and alcohol, and "fed him . . . details about the crimes." 682 F.3d at 572. Law enforcement coerced another witness, who had a history of mental illness and drug abuse, to implicate two suspects. *Id.* At one officer's urging, that second witness turned over a knife that was supposedly a murder weapon, though it was not. *Id.* That witness was also pressured by police to provide a statement about a broken lamp at the scene of the crime and that one of the suspects had a piece of the lamp in his hand, but it was scientifically proven that the lamp had not been broken when the suspect allegedly

---

[2] It is highly improbable that Defendant Officers could make up out of whole cloth the facts attributed to the CI only to have them confirmed by the unimpeached testimony of Smith.

held the piece of it.  *Id.*  Years later, both witnesses gave sworn statements that the police had told them what to say.  *Id.*

This case is unlike *Whitlock*.  There is no evidence that Brooks was told what to say.  In fact, when asked whether Sollars told Brooks what to say, Brooks testified unequivocally, "No."  (ECF No. 125-15 at 72–73 (explaining Sollars was "tellin' [Brooks] stuff like, well, 'We know it didn't happen here.  We know this happen. We know 'Nano' did it.'").  Brooks may have been coerced and pressured to give a statement, but "there is a difference between coercing witnesses to testify and fabricating witness testimony." *Petty*, 754 F.3d at 422.  But, unlike the witnesses in *Whitlock*, the record fails to raise a reasonable inference that Brooks was told what he was supposed to say.  The evidence does not raise a reasonable inference that Brooks' pretrial written statements were false.

Furthermore, Brooks' statements implicating Humphrey were corroborated by Smith's statements.  Humphrey responds that Smith's statements were unreliable. Humphrey argues that a jury could find that Brooks told Smith what the police believed about the Laflin murder, including that Humphrey committed the murder, and that the police had been harassing Brooks about the murder.  From this, Humphrey submits that the jury could then find that Smith's testimony was also false and a result of the fabrication of Brooks' statement.  That stretches reasonable inferences too far.

First, the record does not raise a triable issue as to the falsity of Brook's pretrial written statement.  Second, although Sollars told Smith about the case before

questioning him, (ECF No. 139-1 at 133), there is no evidence to suggest that Sollars or anyone else pressured, threatened, or coerced Smith, or even told Smith to give a statement implicating Humphrey or to give a statement consistent with what Brooks may have told Smith about the Laflin murder.  There is absolutely no evidence to even raise an inference that Sollars, Young, or Cummings ever told Smith what to say.  Besides, Smith's statements were consistent with Sites' ultimate description of how the shooting occurred and its location.  And, in implicating Humphrey, Smith identified someone who closely fits Sites' description of the shooter.  Humphrey has not shown that Smith's statements were fabricated or even unreliable.

Based on the other information known to Sollars, he could not have known "with certainty" that Brooks' pretrial statement was false: Laflin was attempting to buy drugs at that time of the shooting; Humphrey lived at 1405 Fountain Street, close to the location of the shooting as provided by Sites—outside a garage across from the parking lot at Fountain Street Apartments (which turned out to be Brooks' garage); Humphrey associated with Brooks; Brooks and Humphrey had been arrested together in mid-May 1995; Brooks and his friends frequented his garage; the garage was in an area known for drug trafficking, (Young Dep., ECF No. 125-23 at 43–44); Humphrey was arrested in 1994 for possession of crack cocaine, (ECF No. 125-6 at 15); in October 1994 a witness reported Humphrey had a black gun, (ECF No. 125-6 at 6); Sites had described a black semi-automatic handgun; Humphrey was a suspect in the shooting of a vehicle, (ECF No. 125-6 at 15); a May 31, 1995, police report indicated that a female claimed a black male living at 1405 Fountain Street sold her

"soap" (fake cocaine) instead of crack cocaine, (ECF No. 14); Humphrey was believed capable of violence; and Humphrey closely fit Sites' description of the shooter.[3] Evidence of other suspects would not raise a triable issue as to the knowledge of the truth or falsity of Brooks' statement.   Given all the other information about Humphrey known to Sollars, Brooks' statement may have been true.

The evidence fails to raise a reasonable inference that Sollars, Young, or Cummings knew with certainty that Brooks' statement was false.

Humphrey also alleges a due process claim based on the deliberate withholding of exculpatory evidence.  "Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys—a corollary to the prosecutor's obligation to disclose such evidence to defense counsel." *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 349 (7th Cir. 2019) (citing *Brady* [*v. Maryland*], 373 U.S. 83 [(1963)]).  To prevail on a claim against a police officer for the failure to disclose exculpatory or impeachment evidence, a plaintiff must show that: (1) the evidence at issue was favorable to the defense; (2) the officer concealed the evidence; and (3) the concealment prejudiced the defendant.  *Id.*  Generally, the *Brady* "rule encompasses evidence known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999); *see also Goudy v. Cummings,* 922 F.3d 834, 837 (7th Cir. 2019) ("Police officers generally discharge their *Brady* obligations by turning

---

[3] Defendants claim that Humphrey confirmed he sold real and fake crack cocaine to persons who passed by Brooks' garage, (ECF No. 127 at 33–34, but it is unclear when this admission was allegedly made.

over such evidence to the prosecutors, who in turn have a duty to disclose the evidence to the defense.").

Defendant Officers contend first, that there is no evidence that anyone used coercive interrogation tactics against Smith, and second that Humphrey's trial attorneys had the transcripts of Smith's videotaped statements.  Tellingly, Humphrey has not responded to these arguments and therefore concedes them.  (ECF No. 140 at 47–51 (limiting suppression of exculpatory evidence to alternative suspects).)  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.")  Instead, Humphrey argues that Defendants withheld exculpatory evidence of alternative murder suspects, including Laflin's drug dealer "Troy the Triggerman."  The evidence was suppressed, Humphrey says, because his criminal defense attorney testified at his deposition in this case that if he had information about alternative suspects, he would have used that information at trial, and the trial transcript fails to show any reference to other suspects.  In addition, Sollars testified that if he tendered his entire file to prosecutors in a homicide case, it was his practice to create a supplemental report documenting that he had done so.  There is no such report in the case file.  Thus, Humphrey submits that a jury could infer that the evidence was withheld from him.

Humphrey has not presented sufficient evidence to raise a genuine issue of material fact.  Humphrey's trial lawyer could not say whether or not he had received information about other suspects in the case; the lawyer simply could not recall.  (ECF No. 139-13 at 6.)  Besides, whether Humphrey's trial lawyer would have used the

information about alternative suspects at trial is based on speculative hindsight. "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Village of Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004).  In addition, the record reflects that on June 6, 9, and 15, and November 19 a prosecutor reviewed the case.  (ECF No. 125-3 at 66, 68, 73, 90.) Further, the prosecutor's office file for Humphrey's murder case included copies of the investigative reports regarding alternative suspects, including Troy the Triggerman.  (ECF No. 152-1 at 19-27, 61-63; ECF No. 152-2 at 3-5, 39-50, 75-77.)  In short, the Defendant Officers did disclose this information to the prosecutor, thereby discharging their duty under *Goudy*.  Given this evidence, no reasonable jury could find that the evidence of alternative suspects was withheld from the prosecutor. Furthermore, Humphrey has not argued that Cummings withheld any exculpatory evidence or otherwise caused such evidence to be withheld.

The Court finds that the evidence fails to raise a genuine issue of material fact as to the fabrication of inculpatory evidence or the withholding of exculpatory evidence. Brooks' pretrial statement and the other facts and circumstances learned about Humphrey and the Laflin murder from the homicide investigation by the time of the arrest provided probable cause for Humphrey's arrest for murder.  The evidence included, but was not limited to, the eyewitness accounts from Brooks and Sites and the fact that Humphrey closely fits Sites' description of the shooter.  Therefore, Humphrey cannot establish a violation of his constitutional rights to a fair trial, due process, or a deprivation of liberty without probable cause.  Defendants are granted

summary judgment on the Fourth Amendment claim, the Fourteenth Amendment claim, and the malicious prosecution claim.

### Counts IV and V

Count IV alleges the failure to intervene to prevent the violation of Humphrey's constitutional rights and Count V alleges a § 1983 conspiracy claim.  Defendants seek summary judgment on these claims, too.  Each of these claims requires proof of an underlying constitutional violation.  *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 344 (7th Cir. 2019).  Because Humphrey has insufficient evidence to raise a triable issue as to any underlying constitutional violation, Defendants are necessarily entitled to summary judgment on the failure-to-intervene and conspiracy claims.

### Conclusion

Defendants Sollars and Young's Motion for Summary Judgment, (ECF No. 125), is **granted** and Cummings' Motion for Summary Judgment, (ECF No. 130), is **granted**.  The three motions to bar expert testimony, (ECF Nos. 160, 161, and 162), are **denied as moot**.  The Clerk is directed to enter final judgment.

**SO ORDERED.**

Date: 9/30/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution via CM/ECF to all registered parties